IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Matthew W. Waddell, | ) | Case No. 1:17-cv-01078 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I.      Introduction

An administrate law judge denied Plaintiff, Matthew D. Waddell's,[1] application disability

insurance benefits ("DIB") for the period from February 3, 1999 through June 30, 2003 and his

protective application for supplemental security income ("SSI") from June 17, 2014 through

March 1, 2016, the date of his decision, under Titles II and XVI of the Social Security Act.  (Tr.

12)  The ALJ found that Waddell was not disabled because he could perform a significant

number of jobs in the economy despite his impairments.  (Tr. 20)  Waddell's SSI claim was

denied initially on November 12, 2014 (Tr. 106) and upon reconsideration on January 20, 2015.

(Tr. 126)  The Appeals Council denied Waddell's request for review on April 27, 2017, leaving

---

[1] Plaintiff's complaint was filed in the name of "Matthew W. Waddell," and that name appears in the caption and body of all case filings.  All SSA and records contain the name Matthew D. Waddell, including a form handwritten by him, ECF Doc. 10, Page ID# 278, Tr. 223-230.  The court refers to plaintiff as Matthew D. Waddell herein.

the ALJ's decision as the final decision of the Social Security Commissioner.  20 C.F.R. § 416.1481.

Waddell seeks review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) and 1383(c)(3).  Because: (i) the ALJ did not err in finding that Plaintiff only had moderate limitations in social functioning, (ii) substantial evidence supported the ALJ's credibility determination, and (iii) the vocational expert's testimony constituted substantial evidence that supported the ALJ's determination that there are jobs that exist in significant numbers in the national economy that Waddell can perform, I recommend that the final decision of the Commissioner be AFFIRMED.

## II.     Evidence

Waddell now raises three arguments: (1) the ALJ's finding that Waddell had only moderate limitations in social functioning was not supported by the evidence of record; (2) the ALJ's credibility determination was not supported by substantial evidence; and (3) Waddell's residual function capacity ("RFC") finding and the hypothetical question based on that RFC were not supported by substantial evidence.  *See* ECF Doc. 12, Page ID# 429.  Because the issues Waddell has raised are limited, it is not necessary to summarize the entire administrative record.

### A.     Relevant Personal, Educational, and Vocational Evidence

Waddell was 34 years old on the date of the hearing.  (Tr. 31)  Waddell dropped out of school in the tenth grade (Tr. 320) but obtained a G.E.D.  (Tr. 203)  He also completed a few college classes in an information technology major, but had to quit due to physical illness.  (Tr. 307-08)  His past work experience included work as a computer repair technician, delivery driver, wave solderer, and work in customer service.  (Tr. 34, 67-68, 203)  "There were a few

work attempts in 2002-2006, though none apparently was performed at the substantial gainful activity level."  ECF Doc. 12, Page ID# 433.

**B.    Medical Evidence**

The record contained no evidence of medical or psychological treatments between February 3, 1999, the alleged onset date of Waddell's disability, and June 30, 2003, Waddell's alleged last date insured.  (Tr. 65, 88, 90)

On May 6, 2014, Martha Yeager, BA, LSW, a service provider at Beacon Health, performed an initial adult diagnostic assessment of Waddell's behavioral and functioning problems.  (Tr. 306)  Ms. Yeager noted that Waddell had previously received services with Pathways in 2007.  (Tr. 306, 308)  Waddell reported that he believed he had depression, had very low patience for interacting with people, and was unable to deal with people for long periods.  (Tr. 306)  Waddell reported that his former girlfriend still provided him with emotional support and was his "Skype friend."  (*Id.*)  He reported his friends Eric and JR "are married and less available," but that Eric did encourage him to visit.  (*Id.*)  Waddell reported that he took his son to the movies every month or so.  (Tr. 307)  He reported that he "linked with MeetUp.com on the internet and was going to Mayfield to play board games but could not afford gasoline for [*sic*]."  (*Id.*)  Waddell indicated that he wanted to work (Tr. 308) and had been putting out applications for 6-9 months, but reported that he had felt unable to work for more than one month or two.  (Tr. 307)  Waddell reported that he quit his job at a video store "due to becoming irritable and [his] wife being in labor."  (Tr. 308).  Waddell reported that he had taken Amitriptyline and Zoloft.  (Tr. 309)  He reported having memory problems.  (Tr. 311)  Ms. Yeager diagnosed Waddell with moderate major depressive affective disorder, recurrent episode.  (Tr. 314)  Ms.

Yeager's treatment recommendations included pharmacological management services, behavioral health counseling services, and employment services. (*Id.*)

On May 20, 2014, Susan Whittaker, PMHNP-BC, conducted an initial psychiatric evaluation. (Tr. 320-323) Waddell reported that he could not work because of he could not deal with people. (Tr. 320) He reported that he used to take drugs, including THC and LSD, and drink alcohol, but stopped at age eighteen. (*Id.*) He reported that he dropped out of school in the tenth grade because he was having a lot of fights and had been suspended multiple times. (Tr. 321) He was married for less than five years and before getting divorced. (*Id.*) He reported that he had "stormed out of multiple jobs." (*Id.*) Waddell reported that during the day he watched television, exercised on a treadmill for thirty minutes per day, talked to a friend online, and played games. (*Id.*)

Ms. Whittaker found Waddell was depressed and had a full affect. (*Id.*) His behavior was cooperative, withdrawn, and showed a lack of interest. (Tr. 322) His cognition was average and he showed impairment in attention and concentration. (*Id.*) Ms. Whittaker noted that Waddell reported being unable to work. (*Id.*) Whittaker diagnosed Waddell with major depression. (*Id.*) She rated the severity of Waddell's illness as "mildly ill." (Tr. 323) Whittaker prescribed Wellbutrin. (Tr. 303, 323) On June 10, 2014, Ms. Whittaker discontinued Wellbutrin and started Waddell on Lexapro. (*Id.*) Waddell cancelled his appointments on July 8 and 25, 2014. (*Id.*)

In June and July of 2014, Waddell had multiple counselling sessions with Timothy Warneka. (Tr. 359-66). Mr. Warneka found both his observations and Waddell's presenting condition were unremarkable. (Tr. 359, 362, 364, 366, 368, 370) Mr. Warneka noted that Waddell had no reported impairments, issues with perception, self-harm, aggressiveness, or

4

delusions.  (Tr. 359, 362, 364-72).  Mr. Warneka described Waddell as being "moderately ill."
(Tr. 305)  Mr. Warneka recommended counseling sessions.  (Tr. 366).  Mr. Warneka also gave
Waddell assignments as part of his treatment (Tr. 366), which Waddell did not work on (Tr.
368).  Mr. Warneka noted improvement in Waddell's condition.  (Tr. 368, 370, 372)

In an incomplete record of a July 29, 2014 individual counseling session, an unidentified
service provider found that his observations of Waddell and his presenting conditions were
"remarkable."  (Tr. 372)  The service provider noted Waddell seemed to have a "significant"
memory problem, because Waddell reported he could not remember how to travel to specific
places, "information from session to session," "how things work in his house at times," "most of
his recent past," or "almost anything from yesterday."  (*Id.*)  The service provider referred
Waddell to a neurologist.  (*Id.*)

In October 2014, Waddell attended six out of thirty prescribed sessions of physical
therapy for complaints of neck stiffness.  (Tr. 350-57)  Waddell's his intake form indicated that
he had no cognitive or emotional barriers that could possibly affect his care or learning.  (Tr.
356)  He was discharged after cancelling appointments and failing to return for physical therapy.
(Tr. 350)

On November 12, 2014, Norton Winer, M.D. evaluated Waddell regarding his complaint
of memory loss.  (Tr. 344)  Waddell's neurological exam and mental status exam were both
normal.  (Tr. 346)  Dr. Winer recommended neuropsychiatric testing.  (*Id.*)

### C.  Opinion Evidence

#### 1.  Natalie M. Whitlow, Ph.D. – Consultative Psychological Examiner

On October 10, 2014, consultative examiner and psychologist, Natalie M. Whitlow,
Ph.D., evaluated Waddell.  (Tr. 335)  Waddell reported that he was applying for SSI benefits

because he'd had "a problem dealing with people for extended periods of time."  (Tr. 336)

Waddell stated that people irritated and frustrated him, which caused him to verbally "lash out."

(*Id*.)  Waddell also complained of depression and stated that he felt down, did not want to leave

his house, slept a lot, and had low motivation and energy levels.  (*Id*.)  He reported that he had

been diagnosed with depression and agoraphobia, but felt agoraphobia did not fit because he was

not afraid to leave his house.  (Tr. 336-37)

Waddell reported that he stopped attending school in the tenth grade due to excessive

fighting and other problematic behaviors.  He earned his G.E.D. in 1999.  (Tr. 337)  Waddell

reported that he was receiving physical therapy for his neck due to limited mobility, but denied

having any physical health conditions that impaired his ability to effectively work.  (*Id.*)

Waddell reported that he was prescribed, but not compliant with his psychotropic medications

because of the effects they had on his mood and temper.  (*Id.*)  Waddell reported that he smoked

marijuana between the ages of 16 and 18 and that he did not have interpersonal problems during

that time.  (*Id*.)

Waddell reported that in 2008 he worked in an isolated position with computers, but

stopped working due to lack of opportunity.  (*Id*.)  He stated he did not continue working

because he was unable to find an appealing job in which he didn't have to deal with people.  (*Id*.)

Waddell reported that he had a history of work attendance problems because "he would make up

excuses to not have to come in so that he didn't have to go in and deal with people."  (*Id*.)  He

reported "a work history of interpersonal problems related to desires to isolate and excessive

levels of irritation, agitation, and frustrations when interacting with people."  (*Id*.)  He reported a

history of being terminated due to "excessive call offs."  (*Id*.)  Waddell reported unhealthy sleep

and eating patterns.  (Tr. 338)

Dr. Whitlow found that Waddell's behaviors appeared to be within the normative range of functioning and that he was of sound mind, alert, attentive, and coherent in his communication.  (*Id*.)  She found Waddell's speech was within the normative range of functioning, his thought process was appropriate, and his in-evaluation affect was stable and appropriate.  (Tr. 339)  Waddell did not report or present symptoms of anxiety.  (*Id*.)  He appeared to be oriented to person, place, time and event.  (*Id*.)  Dr. Whitlow found Waddell appeared to possess average to above average cognitive functioning and fair insight and judgment.  (*Id*.)  Dr. Whitlow noted that "it [was] important to note that claimant's perspective of his mental health concerns may be more severe than they are actually being experienced."  (Tr. 339)

Dr. Whitlow diagnosed Waddell with major depressive disorder ("MDD"), recurrent and moderate, and an unspecified problem related to social environment.  (Tr. 340)  She rated Waddell's mental health prognosis as fair "based on the moderate level of his symptomology, the moderate level of impacts that his symptoms have on his functioning, and his self-report that he is not compliant with psychotropic prescriptions, and that he has only been receiving psychological intervention for 6 months."  (Tr. 340)

Dr. Whitlow found that Waddell's self-report was consistent across the interview and congruent with his claims that he struggled with mental health symptoms related to MDD, interpersonal conflict, and irritability.  (*Id*.)  She found Waddell's "affect and presentation were inconsistent with his reports that he is currently struggling with MDD symptoms in his daily life" and that his self-report was inconsistent Dr. Whitlow's professional observations.  (*Id*.)  She stated that Waddell's self-reports were not invalidated by her observations, but were not strongly

supported.  (*Id*.)  Dr. Whitlow noted that she reviewed documentation showing Waddell had a history of being diagnosed with MDD, which supported his self-reports.  (*Id*.)

Dr. Whitlow concluded that she did "not have concerns about the impacts of [Waddell's] depression on his behavioral, affective, cognitive, and overall functioning, including his ability to effectively engage in the work world."  (Tr. 340-41)  Dr. Whitlow further opined that Waddell "could potentially experience decreased symptoms of depression with increased compliance to behavioral health interventions, including psychotropic medication compliance and continuing to attend and be invested in talk therapy."  (Tr. 341)  She stated she did "not have sufficient evidence to support stating that the claimant is unable to effectively engage in [the] work world."  (Tr. 341)  She opined that Waddell is capable of effectively managing his own funds.  (*Id*.)

Dr. Whitlow opined that Waddell did not have functional limitations in understanding, remembering, and carrying out instructions, maintaining attention and concentration, or in maintaining persistence and pace to perform simple tasks or multi-step tasks.  (Tr. 341)  She found Waddell had limitations in responding appropriately to supervision, coworkers, and work pressure in a work setting.  (*Id*.)

### 2.    Carl Tishler, Ph.D. – State Agency Psychological Consultant

On November 9, 2014, state agency psychological consultant Carl Tishler, Ph.D. evaluated Waddell's medically determinable impairments.  (Tr. 64-65)  He found Waddell had a medically determinable impairment – affective disorders – which did not precisely satisfy the diagnostic criteria of Listing 12.04.  (*Id*.)  With regard to the "B" criteria of Listing 12.04, Dr. Tishler opined that Waddell had: mild restriction in activities of daily living and difficulties in maintaining concentration, persistence or pace; moderate difficulties in maintaining social functioning; and no repeated episodes of decompensation.  (*Id*.)  Dr. Tishler opined that

Waddell's statements about the intensity, persistence, and functionally limiting effects of his symptoms were not substantiated by the objective medical evidence alone.  (Tr. 65)  Dr. Tishler found Waddell's statements regarding his symptoms were only "partially credible" in light of the total medical and non-medical evidence in file.  (*Id*.)  He found Waddell's statements regarding his very bad memory to be only partially credible, because Waddell showed no evidence of memory difficulty at his psychological evaluation.  (*Id*.)  Dr. Tishler assigned great weight to Dr. Whitlow's opinions, because he found them consistent with the evidence on file.  (Tr. 66)

In his RFC assessment, Dr. Tishler opined that Waddell had no understanding, memory, concentration, or persistence limitations.  (*Id.*)  He opined that Waddell was markedly limited in his ability to interact appropriately with the general public, not significantly limited in his abilities to ask simple questions, request assistance, or maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (*Id*.)  He opined that Waddell was moderately limited in his abilities to get along with coworkers or peers without distracting them or exhibiting behavioral extremes and to accept instructions and respond appropriately to criticism from supervisors.  (*Id*.)  Dr. Tishler opined that Waddell was not significantly limited in his abilities to be aware of normal hazards and take precautions, travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others, but was moderately limited in his ability to respond appropriately to changes in the work setting.  (Tr. 67)  He opined that Waddell would do best performing jobs that did not require more than occasional changes.  (*Id.*)

### 3.    Leslie Rudy, Ph.D. – State Agency Psychological Consultant

On January 20, 2015, state agency psychological consultant Leslie Rudy, Ph.D. opined that Waddell had the medically determinable impairments of spine disorders and affective

disorders.  (Tr. 87)  Dr. Rudy had the same opinion as Dr. Tishler with respect to the Listing

12.04 criteria and concerning Waddell's credibility.  (Tr. 87-89)  She noted the records were

insufficient prior to the date Waddell was last insured.  (Tr. 88)  In her mental RFC assessment

regarding the period from June 17, 2014 to January 20, 2015, Dr. Rudy had the same opinions as

Dr. Tishler regarding Waddell's minimal limitations.  (Tr. 101-02)  She opined that Waddell

should not work with the general public and would do best in environments that did not require

close over-the-shoulder supervision.  (Tr. 102)  She opined that Waddell could relate to

coworkers and supervisors on an intermittent superficial basis.  (*Id*.)  She also opined that

Waddell would do best performing jobs that did not require more than occasional changes.  (*Id*.)

     **D.**       **Hearing Testimony and Function Report**

          **1.**       **Claimant's Function Report**

     On July 21, 2014, Waddell completed a function report.  (Tr. 223-230)  He stated that he

interacting with people for long periods frustrated him, and the frustration progressively got

worse and made him "explode with anger by yelling and quitting [his] job."  (Tr. 223)  He stated

that he checked his "daily routine checklist" to help him remember to clean, perform personal

hygiene, and take his medicine and then he would watch TV or a movie or play a game to pass

the time until bed.  (Tr. 224-25)  He stated that he cared for his two children by making food and

watched them, with his parent's assistance.  (*Id*.)  He stated that before his illness he was "far

more social."  (*Id*.)  He stated that he prepared his own meals daily, although his mother made

his dinner.  (Tr. 225)  He stated that he could drive a car, but only went out rarely because he

tried to avoid people so that he did not get frustrated.  (Tr. 226)  He stated that his mother usually

did his grocery shopping.  (*Id*.)  Waddell stated that he spent time with others and talked daily

with his friend on the computer.  (Tr. 227)  He indicated that he had problems getting along with

his family, friends, neighbors and others and that he had lost most of his friends and did not go anywhere.  (Tr. 228)  He stated that he did not get along with very many people or authority figures and that his memory was very bad.  (Tr. 228-29)  He stated that he was good at following spoken directions, but might forget complicated directions.  (Tr. 228)  He stated that he did not handle people-caused stress well.  (Tr. 229)  He indicated that his ability to handle changes in routine depended on the kind of changes.  (Id.)

### 2.      Claimant's Hearing Testimony

On February 5, 2016, Waddell testified at the administrative hearing that he lives with his mother, father, two sons, his niece, and his nephew.  (Tr. 32)  He reported that he had a G.E.D. and took two classes at a community college, but did not go any further.  (Tr. 33)  Waddell reported that he worked at the Italian group, Christina Greci, IT Electronics, Apsco, and as an operator of a wave soldering machine at Reserves Network.  (Tr. 33-34)  Waddell testified that he worked on his own for the most part in his wave soldering machine operator position, but that occasionally he would need to work in other departments and interact with one to ten other co-workers.  (Tr. 50-51)  He stated that he would only interact with supervisors one minute for every few hours.  (Tr. 51)  Waddell stated that he never stayed too long at any one job because he would either miss too much work or would get "verbally aggressive and yell and storm out." (Tr. 38)  Waddell also testified that he was fired from his wave soldering machine operator position because he was laid off.  (Id.)

Waddell stated that he was unable to work because he had a difficult time remembering things unless he wrote them down and that he kept a paper or notebook near him.  (Tr. 39)  He also stated that he just hated people and that he was unable to work because of fear that he might hit people.  (Id.)  He also stated that he would have verbal confrontations with his coworkers and

11

would go into a rage and quit his job.  (Tr. 47)  Waddell also complained of allergies.  (Tr. 42)  Waddell stated that he would miss a lot of work when he was working, sometimes as much as one day a week, because he would call in sick when he felt that he "couldn't bring [him]self to want to deal with people that day."  (Tr. 45)

Waddell stated that he was not being treated at the time of the hearing.  (Tr. 40)  He stated that the counselor at Beacon Health said he could not do anything for him unless Waddell "figured something out with the neurologist" because Waddell could not remember what he was told or what exercises he was assigned from one appointment to the next.  (Tr. 40-41)  Waddell stated that although neurologist Dr. Winer recommended that Waddell see a neuropsychiatrist, Waddell did not see one because he forgot about the recommendation.  (Tr. 39)  Waddell stated that he was not sure that he had actually been diagnosed with agoraphobia or anxiety.  (Tr. 41)  He also stated that he was not taking any medications, because the last medication he took made him confused.  (Tr. 44)

Waddell testified that he spent his day with his kids, when they were home, and that he slept a lot, didn't really want to get out of bed usually, and wrote things in his notebook.  (Tr. 42)  Specifically, Waddell stated that he would write down the things that ne needs to do the next day and time sensitive things in his notebook, because he may not remember some things otherwise.  (Tr. 46)  Waddell stated that he does chores, including cleaning his living room, bedroom, and bathroom and laundry.  (Tr. 43)  He stated that he has more than one friend, but that other than one friend whom he talks to on the phone daily, he has not talked to his other friends in a long time.  (Id.)  He testified that he had tried to join a board game group, but that after two meetings he "couldn't deal with it" because of all the people.  (Tr. 44)  He stated that his hobbies were

watching television and movies and he generally had no problem following the plot and everything happening in a movie.  (*Id.*)

### 3.      Vocational Expert Testimony

The ALJ asked VE Dr. James Lozer whether a hypothetical individual of Waddell's age and education could perform Waddell's past job as a wave solderer with the following limitations: the individual was limited to occasional interactions with supervisors, coworkers and the public; and could tolerate occasional workplace changes.  (Tr. 49-50)  The VE testified that the hypothetical individual could not perform Waddell's past work as a solderer machine operator, but could perform other jobs in the medium, unskilled category such as a custodian, assembler, or dishwasher.  (Tr. 51-52)

The ALJ asked whether the VE's answer would change if the same hypothetical individual was also limited to no contact with the public.  (Tr. 52)  The VE stated that, based on his experience, the individual could still work as an assembler or dishwasher, but that there would be fewer available custodian positions.  (*Id.*)

The ALJ then asked whether the VE's response would change if the same hypothetical individual, in addition to having no interactions with the public, was also unable to have interactions with coworkers.  (Tr. 52-53).  The VE testified that the hypothetical individual could still work as a custodian, including light, unskilled custodian positions.  (Tr. 53)  The VE testified that the hypothetical individual could also work as a surveillance system monitor.  (*Id.*)

The VE testified that work would be precluded for any of the individuals in the ALJ's three hypotheticals who were to consistently absent from work for two days a month.  (Tr. 54)

On cross examination, the VE stated that the need for the hypothetical individual to keep a checklist of work duties would not preclude any of the identified jobs, provided the individual

was able to function and do his job accordingly.  (Tr. 55)  But the VE testified that if the

hypothetical individual's supervisor had to repeatedly remind the individual of his tasks, work

would be precluded.  (Tr. 56)

## III.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to do
> his previous work but cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which exists in the national
> economy[2]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to

follow the five-step sequential analysis set out in agency regulations, which can be paraphrased

as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe
   before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe
   impairment that has lasted or is expected to last for a continuous period of at least
   twelve months, and his impairment meets or equals a listed impairment, claimant
   is presumed disabled without further inquiry.

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in
the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

14

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

## IV.    ALJ's Findings and Decision

The ALJ's March 1, 2016 decision contained the following paraphrased findings:

1.    Waddell met the insured status requirements of the Social Security Act through June 30, 2003 (Tr. 14);

2.    Waddell had not engaged in substantial gainful activity since February 3, 1999, the alleged onset date (20 C.F.R. 404.1571 et seq., and 416.971 *et seq.*) (*Id.*);

3.    Waddell had the following severe impairments: affective disorders, and memory loss.  (20 C.F.R. 404.1520(c) and 416.920(c)) (*Id.*);

4.    Waddell did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (Tr. 15);

5.    After careful consideration of the entire record, the ALJ found that Waddell had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: occasionally interact with supervisors, co-workers and the general public.  Limited to tolerating occasional workplace changes.  He would be expected to be absent from work one day a month due to his limitations (Tr. 16);

6.    Waddell was unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965) (Tr. 20);

15

7.   Waddell was born on March 10, 1980 and was 18 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963) (*Id.*);

8.   Waddell had at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964) (*Id.*);

9.   Transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Waddell was "not disabled," whether or not Waddell had transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2) (*Id.*);

10.  Considering Waddell's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Waddell could perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)) (*Id.*);

11.  Waddell was not under a disability, as defined in the Social Security Act, from February 3, 1999, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)) (Tr. 21).

Based on these findings, the ALJ determined that Waddell was not disabled from February 3, 1999 through March 1, 2016, the date of his decision.  (Tr. 21)

## V.    Law and Analysis

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the ALJ correctly applied the applicable legal standards.  *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision.");  *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a

16

conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999). "Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. If not, reversal is required, unless the error of law was harmless. *See, e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v.*

17

*Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307

(7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D.

Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was

discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS

141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist.

LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue,* No. 1:09-cv-19822010, 2010 U.S.

Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

Taking into account Waddell's RFC, age, education, past work experience, and the VE's

testimony, the ALJ determined that Waddell was able to perform other work and was, therefore,

not disabled.  (Tr. 20)  Waddell argues that substantial evidence did not support this

determination.  ECF Doc. 12, Page ID# 436.

### B.  Limitations in Social Functioning

Waddell first argues that the ALJ erred in finding that Waddell only had moderate

limitations in social functioning.  ECF Doc. 12, Page ID# 436.  The commissioner counters that

substantial evidence supports the ALJ's finding.  ECF Doc. 13, Page ID# 454.

In his Step Three analysis regarding Listing 12.04 (20 C.F.R. Part 404, Subpart P,

Appendix 1) and Waddell's ability to maintain social functioning, the ALJ stated:

> [i]n social functioning, the claimant has moderate difficulties.  The claimant
> reported talking with a friend on the computer every day.  He also reported
> joining a group to meet and play board games.  [(Tr. 307)]  The claimant stated he
> could not interact with people for long periods of time at work, and he would
> explode after a month or so at a job and then would quit.  [(Tr. 223)]  A
> consultative examiner found that the claimant would have difficulty interacting
> with people, and dealing with normal work pressures.  [(Tr. 341-42)]  This is
> consistent with moderate difficulties in social functioning.

(Tr. 15)  The ALJ concluded that because Waddell's mental impairment did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation the "paragraph B" criteria of Listing 12.04 were not satisfied.  (Tr. 16)

Waddell argues that the ALJ erred in his analysis because "Waddell's testimony was that, although he joined the board game group, he only attended 2 sessions because he could not handle the social interaction."  ECF Doc. 12, Page ID# 437.  Although Waddell testified at the administrative hearing that he "couldn't deal with" the board game group because of "all the people" (Tr. 44), he told his healthcare provider that he stopped going to Mayfield to play board games because he could no longer afford gasoline.  (Tr. 17, 307)

Waddell argues his "uncontroverted and consistent testimony is that . . . his only social interaction is with one friend . . . ."  ECF Doc. 12, Page ID# 437.  Although the evidence of record does indicate that Waddell talked with a friend on the computer everyday (Tr. 15, 43, 227, 306, 321), Waddell told his healthcare provider that he also had two other friends, Eric and his cousin, JR, who were married and less available.  (Tr. 306)  Waddell also testified that he had more than one friend, but that he hadn't talked to them in a long time.  (Tr. 43)  This is the classic situation in which the record evidence could support two different conclusions.  In such scenarios, the law obligates the court to affirm the ALJ's decision, because the ALJ is permitted to decide which factual picture is most probably true.  Where, as here, the discrepancy is between the claimant's own words uttered on two different occasions, the ALJ may also discount hearing testimony on credibility grounds, as will be further discussed below.

Further, the ALJ cited additional evidence supporting his conclusion that Waddell did not have marked limitations in his ability to maintain social functioning.  The ALJ noted with respect to nurse practitioner Whittaker's May 20, 2014 treatment notes that:

19

> [t]his provider found the claimant to have a GAF score of 65, consistent with mild
> symptoms and questioned the claimant's self-report that he was unable to work.
> A GAF score of "61-70" is indicative of only mild symptoms and mild difficulties
> in social or occupational functioning (Diagnostic and Statistical Manual of Mental
> Disorders, Fourth Edition, Text Revision, Washington D.C., American Psychiatric
> Association, 2000, pp. 32-34).  Although the GAF scores alone are not being
> considered as the basis for a disability determination, they are another factor
> examined in determining this claimant's functional capacity.

(Tr. 18, 322) (internal citations omitted)  The ALJ noted that "[t]he records contain[ed] only a few months of mental health treatment, and even those suggest[ed] mild to moderate symptomology."  (Tr. 20, 305, 323)  The ALJ found there was no evidence that Waddell would not improve with medication and therapy, and noted that the Waddell's most recent treatment records predated the hearing by more than 18 months.  (Tr. 20)  As the commissioner notes, the ALJ sufficiently accounted for Waddell's moderate difficulties in social functioning by limiting him to work involving no more than occasional interaction with others.  ECF Doc. 13, Page ID# 455(citing Tr. 16).

State agency psychological consultants, Dr. Tishler and Dr. Rudy, also found that Waddell had moderate difficulties in maintaining social functioning.  (Tr. 19, 64, 87)  Agency regulations provide that state agency reviewing sources are highly skilled medical professionals who are experts in social security issues.  *See* 20 C.F.R. § 416.927.  These opinions provided substantial evidence to support the ALJ's finding that Waddell only had moderate limitations in social functioning.

Substantial evidence supports the ALJ's finding that Waddell had less than marked limitations in social functioning.

### C.     The ALJ's Credibility Determination

Waddell's second argument is that the ALJ failed to support his credibility determination with substantial evidence.  ECF Doc. 12, Page ID# 438.  In particular, Waddell argues that

proper determination of the severity of his memory impairment is critical because: (1) "if his memory impairment were as severe as alleged, it would undoubtedly constitute a marked impairment" allowing him to meet or medically equal Listing 12.04; and (2) it "would make full-time substantial gainful activities nearly impossible."  ECF Doc. 12, Page ID# 439.

Generally, "[a]n ALJ's findings based on credibility of the applicant are to be accorded great weight and deference, particularly since [the] ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir.2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)); *Schmiedebusch v. Comm'r of Soc. Sec. Admin.*, 536 F. App'x 637, 649 (6th Cir. 2013) ("We accord an ALJ's credibility determinations great weight and deference, and are limited to evaluating whether the ALJ's explanations for partially discrediting a claimant's testimony are reasonable and supported by substantial evidence in the record." (Internal quotation marks omitted)).  "'[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability.'" *Schmiedebusch*, 536 F. App'x at 649 (*quoting Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir.2003)).  Further, "[t]he mere diagnosis of a condition does not speak to its severity or indicate the functional limitations caused by the ailment."  *See Taylor v. Comm'r of Soc. Sec. Admin.*, No. 14CV686, 2015 WL 4730716, at *3 (N.D. Ohio Aug. 10, 2015) (citing *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir.1990)).

Here, the ALJ's credibility determination was supported by substantial evidence.  The ALJ found that Waddell's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible.  (Tr. 17)  The ALJ further found that

> [i]n terms of the claimant's alleged disability, the claimant simply has not met his burden to show that his conditions are as severe as he claims.  The records contain

21

> only a few months of mental health treatment, and even those suggest mild to
> moderate symptomology.  In addition, the most recent of these records were from
> more than 18 months prior the date of the hearing.  So not only is there no
> evidence that claimant's condition is [so] severe that it prevents full-time work,
> there is no evidence that the claimant would not improve with medication and
> therapy."

(Tr. 19-20, 305, 323)  "While an ALJ cannot reject subjective reports of symptoms based solely

on a lack of objective evidence, it is one factor that may be considered."  *Garcia v. Comm'r of*

*Soc. Sec.*, No. 1:16 CV 2682, 2018 WL 838371, at *14 (N.D. Ohio Feb. 12, 2018) (citing

*Kirkland v. Comm'r of Soc. Sec.*, 528 F. App'x 425, 427 (6th Cir. 2013)).

The ALJ also noted that nurse practitioner Whittaker questioned Waddell's self-report

that he was unable to work.  (Tr. 18, 322)  The ALJ noted that Waddell had been putting out

applications for six to nine months.  (Tr. 18); *c.f. Magill v. Comm'r of Soc. Sec. Admin.*, No.

3:08CV167, 2009 WL 3064649, at *10 (S.D. Ohio Sept. 21, 2009) (finding that substantial

evidence supported the ALJ's credibility determination in part because the plaintiff was looking

for work).  The ALJ found that "[o]verall, [Waddell's] memory appeared selective which further

reduces the credibility of this complaint."  (*Id.*)  The ALJ concluded that "[a]ny further

restrictions in the claimant's functional capacity would simply be based on the claimant's

subjective complaints and, as discussed above, the claimant's statements in this regard are not

supported by medical evidence."  (Tr. 20)

The state agency psychological consultants, Dr. Tishler and Dr. Rudy, also found

Waddell's statements regarding the severity of his impairments only partially credible.  (Tr. 65,

88).  Dr. Tishler opined that Waddell's statements about the intensity, persistence, and

functionally limiting effects of his symptoms were not substantiated by the objective medical

evidence alone.  (Tr. 65)  Dr. Tishler found Waddell's statements regarding his symptoms were

only "partially credible" in light of the total medical and non-medical evidence in file.  (*Id.*)  Dr.

Rudy viewed Waddell statements as "partially credible" and noted that Waddell "mentions he has very bad memory," but "[h]e showed no evidence of memory difficulty at the psych[ological] eval[uation]."  (Tr. 88)  Dr. Rudy further noted that Waddell "alleges neck pain" but "[h]e has normal strength and sensation" and "does not have any difficulty lifting d/t his neck pain."  (*Id.*)

Further, consultative psychological examiner Dr. Whitlow found that Waddell's "perspective of his mental health concerns may be more severe than they are actually being experienced."  (Tr. 339)  She noted that Waddell's "affect and presentation were inconsistent with his reports that he is currently struggling with MDD symptoms in his daily life" and that Waddell's self-report was inconsistent with Dr. Whitlow's professional observations.  (Tr. 340)  The ALJ gave "great weight" to Dr. Whitlow's opinions.  (Tr. 19)

In the ALJ's analysis regarding Waddell's claimed memory problems, the ALJ noted that Waddell "claims he forgot that the doctor who examined him in 2014 recommended for him to seek neuropsychiatric evaluation," but "he remembered many other details."  (Tr. 20, 39-40)  The ALJ found that overall, Waddell's ability to remember appeared selective, which further reduced his credibility.  (*Id.*)  Waddell argues that this finding is "subjective and not supported by the record" and cites Waddell's reports of having relied on a "daily routine checklist" as early as July, 2014.  ECF Doc. 12, Page ID# 438.  The only evidence Waddell identifies to support his argument are his own statements from the Function Report he prepared (Tr. 224-225) and his own testimony at the administrative hearing (T.46).  *See id.*  The record shows that the ALJ considered Waddell's reported use of a daily reminder checklist.  (Tr. 16, 225)  Although Timothy Warneka of Beacon Health noted that Waddell had significant memory problems in one set of treatment notes (Tr. 18, 372), Warneka generally noted that Waddell had no reported

cognitive impairments and presented unremarkable conditions.  (Tr. 359- 362, 364-371)

Neurologist Dr. Winer's neurological and mental status examinations of Waddell were both

normal.  (Tr. 18, 346)  Dr. Winer found no cognitive issues and he recommended that Waddell

follow up with neuropsychiatric testing.  (*Id.*)  Dr. Whitlow found Waddell possessed average to

above average cognitive functioning.  (Tr. 19, 339)  Further, Waddell did not mention his alleged

memory impairment to Dr. Whitlow (Tr. 19, 336), his primary care providers (Tr. 271, 283), or

his physical therapist.  (Tr. 356)

Substantial evidence supports the ALJ's credibility determination.

### D.    RFC Determination and the Vocational Expert Testimony

Waddell finally argues that the VE's testimony does not constitute substantial evidence

supporting the ALJ's conclusion that Waddell could perform any work because "the ALJ's

residual function analysis, and the hypothetical questions based upon it, were not based on

substantial evidence."  ECF Doc. 12, Page ID# 439 (citing *Howard v. Comm'r of Soc. Sec.*, 276

F.3d 235 (6th Cir. 2002).

"In order for a vocational expert's testimony in response to a hypothetical question to

serve as substantial evidence in support of the conclusion that a claimant can perform other

work, the question must accurately portray a claimant's physical and mental impairments."  *Ealy*

*v. Comm'r of Soc. Sec.,* 594 F.3d 504, 516 (6th Cir.2010).  "Hypothetical questions, however,

need only incorporate those limitations which the ALJ has accepted as credible."  *Parks v. Soc.*

*Sec. Admin.*, 413 F. App'x 856, 865 (6th Cir. 2011) (citing *Casey v. Sec'y of Health & Human*

*Servs.,* 987 F.2d 1230, 1235 (6th Cir.1993)).

Waddell argues that the evidence of record indicates that he could not engage in

substantial gainful activity, or full-time or equivalent work, because of attendance and memory

issues.  ECF Doc. 12, Page ID# 440.  The VE testified that work would be precluded when an individual was consistently absent two days or more a month.  (Tr. 54)  Waddell notes that he testified that when he was working he would call in sick once every couple of weeks and sometimes once a week when he "couldn't bring himself to want to deal with people that day." (Tr. 45)

The commissioner counters that other than Waddell's own testimony, Waddell cited no evidence of attendance or memory issues that would preclude full-time work.  ECF Doc. 13, Page ID# 460.  The commissioner also notes that the ALJ found Waddell's statements regarding his limitations not fully credible.  (Tr. 17)  The commissioner argues that the ALJ's hypothetical questions only need to account for Waddell's credible limitations.  ECF Doc. 13 (citing *Winslow v. Comm'r of Soc. Sec.*, 566 F. App'x 418, 421 (6th Cir. 2014) ("The record reflects, however, that the hypothetical questions were proper because the ALJ incorporated all of the functional limitations that she deemed credible."))

Substantial evidence supports the ALJ's finding that Waddell's statements regarding his own limitations were not fully credible.  Because the ALJ's hypothetical question included the limitations that he found credible, he could rely on the VE's testimony to support the finding that Waddell could perform jobs that exist in sufficient numbers in the economy.  *See Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir.2007).

## VI.     Recommendation

Because: (i) the ALJ did not err in finding that Plaintiff only had moderate limitations in social functioning, (ii) substantial evidence supported the ALJ's credibility determination, and (iii) the vocational expert's testimony constituted substantial evidence to support the ALJ's determination that there were jobs that exist in significant numbers in the national economy that

Waddell could perform, I recommend that the final decision of the Commissioner be

AFFIRMED, pursuant to 42 U.S.C. §405(g).


Dated: May 10, 2018

Thomas M. Parker
United States Magistrate Judge

---

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts
within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may waive the right to appeal the District Court's order.  See
*U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985),
reh'g denied, 474 U.S. 1111 (1986).